Filed 12/17/21  P. v. Johnson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHNNIE DALERAE JOHNSON,<br><br>    Defendant and Appellant. | D077777<br><br><br><br>(Super. Ct. No. INF053406) |

APPEAL from an order of the Superior Court of Riverside County, John D. Molloy, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Alan L. Amann and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury in 2008 convicted defendant Johnnie Dalerae Johnson and Reggie Allan Bullock, Jr. of second degree murder (Pen. Code, § 187, subd. (a))[1] for the beating death of fellow inmate Charles Green at the Chuckawalla Valley State Prison (Chuckawalla). We affirmed Johnson's conviction in *People v. Bullock, et al.* (Nov. 21, 2011, D055890 [nonpub. opn.]) (*Bullock*), concluding Johnson and Bullock were prosecuted as "direct perpetrators" of Green's murder under an implied malice theory and there was "no evidence" to support a finding (for purposes of a lesser-included offense instruction) that Johnson acted without malice during what we described as a "vicious," unprovoked attack on Green. (*Bullock*, *supra*, D055890.)

In January 2019, Johnson filed a petition under section 1170.95 to vacate his second-degree murder conviction (the Petition). The trial court, after appointing Johnson counsel and considering the multiple briefs submitted by the parties, initially issued an order to show cause (OSC) why the Petition should not be granted. It then subsequently reconsidered that ruling and summarily denied the Petition, finding Johnson was ineligible for relief under section 1170.95 as a matter of law. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Johnson's Murder Trial*

Chuckawalla is a low-level prison in California's prison system. In June 2005, Bullock and Johnson were housed in building C-7 on C yard.

---

[1]    All further undesignated statutory references are to the Penal Code unless indicated otherwise.

[2]    We derive the factual background primarily from our *Bullock* opinion, which was included in the record.

Johnson was scheduled to be released in about six months, after he was incarcerated for violating a condition of probation. (*Bullock, supra,* D055890.)

"Frank Barbarossa, Robert Deffenbaugh and Jack Woller also were housed in building C–7.[3]  Barbarossa was the 'shot caller' for white inmates in C yard . . . .  As a shot caller, Barbarossa had authority over what happened in C yard among white inmates; he made decisions and issued orders." (*Bullock, supra,* D055890.)

On June 20, 2005, Green was transferred to C Yard.  On his arrival, Deffenbaugh and Woller asked Green for his "paperwork," which included his commitment offense.  "The following day, Deffenbaugh and Woller learned that Green was a child molester[.]  Barbarossa authorized a 'hit' on Green.  Woller and Deffenbaugh told Barbarossa that Johnson had agreed to assault Green.  Bullock volunteered to help Johnson." (*Bullock, supra,* D055890)

"Johnson wrote an anonymous note to prison guards asking that Green be removed because his life was in danger, and Bullock directly warned Green that he was in danger.  Nonetheless, Bullock and Johnson complied with Barbarossa's directive as transmitted by Deffenbaugh . . . ." (*Bullock, supra,* D055890.)

Sometime after 9:00 p.m. on June 21, Bullock entered the section C bathroom, intercepted Green, and punched him in the chest and kicked him in the head with the bottom of his boot.  Inmate Elton Chubbuck, who was near the bathroom, testified he heard a "loud slap and then 'a kaboom' " while Green and Bullock were in the bathroom.  Immediately after Bullock left the

---

3    Barbarossa, Bullock, Deffenbaugh, and Woller are not parties to this appeal.

bathroom, Johnson entered.  Inmates next heard "slapping, thudding and stomping noises coming from the bathroom before Johnson left."  (*Bullock, supra*, D055890.)

After the attack, Chubbuck entered the bathroom and found Green lying on the floor.  Chubbuck notified correctional officers, and a few minutes later a prison medical team responded to treat Green.  "A medical technician noted that Green had numerous injuries, including a deep laceration to his left temple, bruises and hematomas on both temples, a raised red area on his sternum and abrasions to his upper back."  Shortly before midnight, Green was transported by ambulance to Palo Verde Hospital.  A CT scan showed that Green had a blood clot on his brain.  Due to the severity of his injuries, hospital staff contacted three hospitals with trauma centers.  At 5:45 a.m., Green was flown to San Diego and admitted at 7:40 a.m. to the head trauma center at UC San Diego Medical Center.  (*Bullock, supra*, D055890.)

On arrival, doctors found Green in a comatose condition with fixed dilated pupils.  Doctors determined he had an epidural hemorrhage on the right side of his brain, a blood clot, bruising to his brain and swelling as a result of "blunt trauma injury."  Green underwent surgery, after which he was placed on life support.  Three days later, Green remained nonresponsive and comatose.  After being told Green had an irrecoverable brain injury, his family on June 27 decided to withdraw life support.  Green died shortly thereafter.  (*Bullock, supra*, D055890.)

"Green's autopsy revealed a minimum of six or seven separate impacts to the head.  Green suffered all levels of injuries to his head:  external injuries; skull fractures extending from both eyes; hemorrhages throughout his scalp; two epidural hemorrhages, subdural hemorrhages and bleeding into the brain. . . .  The injuries were unlike those occurring in simple

4

collapse, fall-type situations. [¶] The medical examiner testified the cause of death was blunt-force head injuries." (*Bullock*, *supra*, D055890.)

"When interviewed by a sheriff's detective two months after the attack on Green, Johnson said that he stomped on Green's head 'three or four times' and 'for a couple minutes.' Johnson also said that he stomped on Green's nose with the knowledge that if his nose was pushed into his brain with sufficient force, it would result in brain damage and death. This information was included in a redacted transcript of the interview that was read to the jury." (*Bullock*, *supra*, D055890.)

In defense, a neurosurgeon testified that Green should have received immediate neurological care. The expert testified that the 10-hour delay in getting Green this care was "medically unacceptable and was a substantial factor in the cause of death." (*Bullock*, *supra*, D055890.)

B. *Appeal*

Johnson appealed his second-degree murder conviction. Among other arguments he contended trial counsel was ineffective for failing to object to redactions made to his postarrest statement to police. Johnson also joined Bullock in arguing the court erred in failing to instruct the jury sua sponte on involuntary manslaughter. (*Bullock*, *supra*, D055890.)

In rejecting Johnson's argument his counsel was ineffective, we concluded in the direct appeal that the redacted version of his postarrest interview did not leave the jury with a "misleading picture of his role in Green's attack." To the contrary, we concluded "there [was] no question that Johnson's participation in the attack was extensive and vicious. The jury was aware that Bullock initiated the attack on Green and knew that he pulled Green down from behind, punched him in the chest and then kicked him once in the head. When Johnson entered the bathroom, Green was lying

5

on the bathroom floor defenseless. Johnson elevated the level of violence by repeatedly kicking Green in the head and stomping on his nose. Johnson did this knowing that brain damage or death could result if the nose was forcefully pushed into the brain." Based on this same undisputed evidence, we also concluded that, even if the court erred in making one or two redactions to Johnson's statement, that error was harmless under "any standard of review." (*Bullock*, *supra*, D055890.)

We also rejected Johnson's argument that the trial court had a sua sponte duty to instruct on involuntary manslaughter. We held the evidence was *undisputed* that "Green's fatal injuries were inflicted by the use of great, violent force"; that the "attack was an aggravated felony assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1))"; and that, based on the nature of the attack, its remote location (i.e., the bathroom), and the severity of the injuries Green sustained, "no reasonable jury could find Johnson engaged in the type of activity that would support an involuntary manslaughter conviction." (*Bullock*, *supra*, D055890.)

But that's not all. In addressing Johnson's argument there was evidence to support a lesser-included instruction because the "jury could have concluded that he did not intend to kill Green," we found he was "mistaken," and concluded there was "no evidence," as opposed to merely a lack of substantial evidence, to show Johnson acted without implied malice in the aggravated assault of Green. (*Bullock*, *supra*, D055890.)

C. *The Petition*

In January 2019, Johnson filed his Petition pursuant to Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Sen. Bill No. 1437), which had become effective on January 1. The court appointed counsel to represent Johnson. On January 17, 2020, the court issued an OSC why the Petition should not be

6

granted. The People in response filed a supplemental opposition to the Petition, which Johnson opposed in an OSC brief. The People thereafter filed a memorandum of points and authorities on the scope of an OSC hearing under section 1170.95. Johnson in return filed a reply to the People's points and authorities regarding the scope of an OSC hearing.

On March 13, 2020, the trial judge returned the matter to the previous department for reconsideration of its finding that Johnson had made a prima facie showing for relief on his Petition. On July 24, 2020, the trial court that had originally issued the OSC heard additional argument and, over the defense's objection, agreed with the People that Johnson's record of conviction showed he was statutorily ineligible for relief under section 1170.95 as a matter of law.

In reaching its decision, the trial court exclusively relied on our opinion in the direct appeal. In *Bullock*, we concluded "there was no question that Johnson's participation in the attack was extensive and vicious"; and no evidence Johnson acted without implied malice (*Bullock, supra*, D055890). Because *Bullock* established as a matter of law that Johnson would be convicted of murder notwithstanding the change to section 188, the trial court summarily denied the Petition.

## II. DISCUSSION

A. *Guiding Principles*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with

7

reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*); see *People v. Gentile* (2020) 10 Cal.5th 830, 843.)

As relevant here, Senate Bill No. 1437 achieves these goals by amending section 188 to provide that, "[e]xcept as stated in subdivision (e) of Section 189 [applicable to felony murder],[4] in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

In addition to amending sections 188 and 189, Senate Bill No. 1437 added section 1170.95, which provides a procedure for convicted murderers— who could not be convicted under the law as amended—to seek relief retroactively. Under this statute, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;]
>
> "(2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[; and]
>
> "(3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3).)

---

[4] To be found guilty for murder under newly amended section 189, a person must have been the "actual killer"; or acted with an "intent to kill" and aided and abetted the actual killer in committing first degree murder; or been a "major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e)(1)-(3).)

Counsel must be appointed if requested by petitioner and if his or her petition is facially valid.  (*Lewis*, *supra*, 11 Cal.5th at p. 970.)  "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).)  "If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (*Ibid.*)

Key to the instant case, the Supreme Court recently held that a trial court can rely on a petitioner's record of conviction in determining whether he or she has made a prima facie showing of eligibility under section 1170.95. (See *Lewis, supra*, 11 Cal.5th at p. 971 [the "record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that are clearly meritless"].)  This inquiry is consistent with the overall purpose of section 1170.95, which is "to ensure that murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process.  (See Stats. 2018, ch. 1015, § 1, subd. (f).)"  (*Lewis*, at p. 971.)

Although the prima facie inquiry under subdivision (c) of section 1170.95 is "limited" (*Lewis*, *supra*, 11 Cal.5th at p. 971), if the record of conviction, "including the court's own documents, 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner.' " (*Ibid.*, quoting *People v. Drayton* (2020) 47 Cal.App.5th 965, 979 (*Drayton*).)  Even though appellate opinions are part of the record of conviction, their "probative value" is to be determined on a case-by-case basis and such opinions " 'might not supply all

9

answers.' " (*Lewis,* at p. 972.) In those instances, a trial court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion' " in determining whether a petitioner has made a prima facie showing of eligibility under section 1170.95. (*Lewis*, at p. 972, quoting *Drayton*, at p. 980.)

We review de novo the question of whether the trial court properly reviewed Johnson's record of conviction in determining he was ineligible for relief. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; see *People v. Duchine* (2021) 60 Cal.App.5th 798, 811 (*Duchine*) [applying de novo review to claims of error based on the interpretation of section 1170.95].)

B. *Analysis*

Johnson contends the trial court erred in denying his Petition because "the issue of malice was disputed at trial where he was tried with four other inmates and the jurors easily could have been confused as to whether or how to apply the natural and probable aiding and abetting instructions read after closing arguments." We find this contention unavailing.

First, the trial court properly relied on Johnson's record of conviction, including our opinion in the direct appeal, in determining whether he made a prima facie showing of eligibility for relief under section 1170.95. (See *Lewis*, *supra*, 11 Cal.5th at pp. 970-971; *Drayton*, *supra*, 47 Cal.App.5th at p. 979.)

Second, we agree with the trial court that Johnson is not entitled to relief under the statute as a matter of law. In *Bullock*, we held there was *no evidence* Johnson acted *without* malice in the murder of Green. The trial court thus found our opinion in the direct appeal dispositive in denying Johnson relief under section 1170.95. (See *People v. Murillo* (2020) 54 Cal.App.5th 160, 167, review granted Nov. 18, 2020, S264978 [a denial of a defendant's petition at the prima facie stage under section 1170.95 is

10

proper "if the record of conviction demonstrates that 'the petitioner is ineligible for relief as a matter of law' "]; cf. *Duchine, supra*, 60 Cal.App.5th at p. 816 [reversing denial of a petition for resentencing because trial court engaged in "judicial factfinding on issues not conclusively resolved by the record of conviction"].)

Third, our conclusion in the direct appeal distinguishes the instant case from those decisions that have recently come under scrutiny based on their application of a substantial evidence test. (See, e.g., *People v. Garcia* (2020) 57 Cal.App.5th 100, 106, review granted February 10, 2021, S265692 [concluding a petitioner failed to carry his burden at the prima facie stage because "the record of conviction contains substantial evidence based on which a reasonable trier of fact *could* find the petitioner guilty of murder beyond a reasonable doubt under current law despite the changes made by Senate Bill 1437"]; contra, *People v. Aleo* (2021) 64 Cal.App.5th 865, 872 [recognizing the majority of appellate courts disagree with *Garcia* and have found the substantial evidence test has no application at the prima facie stage]; *People v. Secrease* (2021) 63 Cal.App.5th 231, 246 (*Secrease*), review granted June 30, 2021, S268862 ["In a section 1170.95 proceeding, the ultimate question is not a backward-looking inquiry into whether a past conviction finds support in substantial evidence," but "instead whether, applying changes brought about by Senate Bill 1437, there is a prima facie case 'that [the defendant] did not, in fact, act or harbor the mental state required, for a murder conviction under current law' "].)

Fourth, for the same reason(s) we also reject Johnson's argument that the jury could have been "confused," much less "easily confused" as he contends, by the trial court's aiding and abetting instructions. As we made clear in the direct appeal, Johnson and Bullock were tried and convicted as

11

director perpetrators in Green's murder, while Barbarossa, Deffenbaugh, and Woller were prosecuted on an aiding and abetting theory. (*Bullock, supra*, D055890 ["In this joint trial, Bullock and Johnson were prosecuted as *direct perpetrators* of the murder under a theory they acted with *implied malice*" (italics added)]; (*Bullock, supra*) ["Bullock and Johnson were tried along with Barbarossa, Deffenbaugh and Woller on the murder charge [and] [t]he latter three were prosecuted on an *aiding and abetting theory rather than as direct perpetrators*," (italics added)].) The prosecutor also made clear during closing that Barbarossa, Deffenbaugh, and Woller were liable, if at all, as aiders and abettors and therefore, unlike Johnson, were not being prosecuted as direct participants under an implied malice theory. (See *People v. White* (2014) 223 Cal.App.4th 512, 525 [the record of conviction may include the parties' closing arguments].)

Fifth, we reject Johnson's contention the trial court erred because in *Bullock* we allegedly did not address what he claims is an open-ended issue regarding the accuracy of his postarrest interview transcript. Initially, we note the issue of the accuracy of the transcript was expressly litigated in the direct appeal. We held in *Bullock* the redactions did not leave "the jury with a misleading picture of [Johnson's] role in Green's attack" (*Bullock, supra*, D055890); Johnson was not prejudiced by the redactions; and any error was harmless under any standard of review. (*Bullock, supra.*)

In addition, "[n]othing in the language of section 1170.95 suggests it was intended to provide redress for allegedly erroneous prior factfinding. In particular, subdivision (a)(3) of section 1170.95 says nothing about erroneous prior findings or the possibility of proving contrary facts if given a second chance. Rather, it requires that the petitioner could not be convicted of murder because of the changes to sections 188 and 189, not because a prior

12

fact finder got the facts wrong.  The purpose of section 1170.95 is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved." (*People v. Allison* (2020) 55 Cal.App.5th 449, 461, (italics omitted); see also *Secrease, supra*, 63 Cal.App.5th at pp. 254-255 (review granted) ["section 1170.95, subdivision (c) cannot reasonably be read to permit a 'do-over' of factual issues that were necessarily resolved against a section 1170.95 petitioner by a jury"].)

## III.  DISPOSITION

The order denying Johnson's section 1170.95 petition is affirmed.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.