Filed 4/11/22  P. v. Bayliss CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075770 |
| v. | (Super.Ct.No. FSB17394) |
| MARLON DESHON BAYLISS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Shelia O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Lynne G.

1

McGinnis and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

In 2000, defendant Marlon Bayliss and his half-brother Eddie Hampton were convicted of murder, committed after the two planned to "jack" a bar, armed with firearms provided by defendant, resulting in the shooting death of the business owner by a shotgun blast from Hampton's firearm. Defendant Bayliss was sentenced to a term of 51 years to life and his conviction and sentence were affirmed on direct appeal. In 2019, following passage of Senate Bill No. 1437, defendant Bayliss filed a petition for resentencing pursuant to Penal Code[1] section 1170.95. The trial court found there was a prima facie basis for relief and conducted an evidentiary hearing. However, after that hearing, the trial court denied the petition after it determined Bayliss was a major participant and that he acted with reckless disregard for human life. Defendant appeals.

On appeal, defendant argues the trial court applied the wrong standard of proof in evaluating the merits of the petition, and that the evidence on which the court based its decision (the record of conviction in addition to a new fact stipulated by the parties) does not support a conclusion Bayliss was not entitled to resentencing. We affirm.

## BACKGROUND

We recite the background facts as set forth in our unpublished opinion in case No. E023847, *People v. Marlon Bayliss et al.*, filed on June 14, 2000, with added information regarding the current petition:

---

[1] All further statutory references are to the Penal Code, unless otherwise stated.

2

Sheryl Hilt was Bayliss's girlfriend. As of November 22, 1996, they had lived together for six or seven months. On the evening of November 22, 1996, she, Bayliss, Hampton, Bayliss's brother Tommy, and Mark Burley were together at Hilt's and Bayliss's house. Sometime during the afternoon or evening, Burley left.

At 10:00 or 11:00 p.m., Hilt overheard a conversation between Bayliss and Hampton; Tommy Bayliss was present with them, but Tommy did not appear to be taking part in the discussion. Bayliss and Hampton were talking about doing a "jack move" (robbery). They talked about using Hampton's car and robbing a bar.

At 2:00 or 3:00 a.m., on November 23, Hampton and Bayliss left the house together. Hampton carried a shotgun wrapped in a sheet. Hilt thought they left in Hampton's car, because Tommy's gray car was still parked outside the house.

Bayliss returned to the house at 4:00 or 5:00 a.m. As he got into bed, he told Hilt that "something went wrong."

As of November 23, 1996, David Reno was staying at a house on Ninth Street in San Bernardino. At approximately 3:00 a.m. on that date, he was outside smoking a cigarette. He saw a dark-colored car come east on Ninth Street, turn around in a dirt field on the south side of the street and return west on Ninth Street, and then turn south at the next intersection, onto Sterling Avenue. He saw the same car repeat the same maneuver two or three times. After one of the passes, the dark car turned in at an apartment building on Ninth Street.

3

Soon, Reno saw two Black men walk by.  One man looked taller than the other, and the shorter man seemed huskier to Reno.  The two men wore dark clothing and jackets, and they wore knit caps or beanies on their heads.  One of the men carried a shotgun.  The men appeared to cross a field on a path that led from Ninth Street to Sterling Avenue.  A liquor store was two buildings south of the field on Sterling Avenue.

After five or ten minutes, Reno heard gunshots.  The gunshots sounded as if they came from the liquor store.  The same two Black men came running past Reno.  Again, one of the men carried the shotgun, but Reno could not tell if it was the same man who had carried the gun before.  The men ran to the apartment complex and out of sight.  Three or four minutes later, the dark car left the apartments, heading eastbound on Ninth Street, and turning north onto McKinley Street.

Kenneth and Denyse Elder lived in the apartment building on Ninth Street.  Denyse was upstairs at another apartment baby-sitting.  Kenneth was at home.  At approximately 3:00 a.m., they each heard gunshots, and, soon afterward, sirens.

Kenneth saw a car pull up to a dumpster in the parking lot of the apartment complex.  He saw a man get out of the car and throw something over a brick wall.  Kenneth went upstairs to see Denyse and take her a cigarette.  As he returned downstairs, he saw a Black man who looked like Hampton.  They exchanged a short greeting: "What's up."  Kenneth saw the man go toward the laundry room and start talking to another man, who looked like Bayliss.

4

From the upstairs apartment where she was baby-sitting, Denyse saw a car with its headlights off leaving the parking lot. She thought the car was a Mustang, because she saw the taillights grouped in threes; she had owned a Mustang several years earlier. Kenneth also thought the car he saw by the dumpster was a Mustang.

At approximately 3:30 a.m., the San Bernardino County Sheriff's Department received a silent alarm call emanating from the liquor store on Sterling Avenue near Ninth Street. Deputy Camacho and Sergeant Curry responded to the scene. They found blood on the handle of the front door of the liquor store. Inside they found the proprietor lying on his back in a pool of blood. The victim was still moving, but did not respond to Deputy Camacho's questions.

Paramedics took the victim to the hospital, but he died. The victim was killed by gunshot wounds. Nearly a dozen shotgun pellets inflicted wounds, mostly to the victim's front and right side; he had apparently been turning away from the blast. The pellets struck and injured many of the victim's internal organs, including the liver, right kidney, intestines, and a major blood vessel in the leg.

In the morning of November 23, the Elders looked into the apartment dumpster where the strange car had pulled up. They saw a blue Pendleton shirt inside. On the other side of the wall, where Kenneth had seen one of the men throw something, they located a blue steel .38-caliber revolver. They showed sheriff's detectives what they had found. Investigating officers also found a knit cap on a fence near the apartment complex, and a baseball cap in the back yard of a nearby house.

5

Sheryl Hilt testified that she had seen Hampton wearing the blue Pendleton shirt on the night he and Bayliss talked about doing a robbery. She said that her sister's husband had sometimes worn the baseball cap police had found, and the knit cap belonged to her cousin Francisco. Hilt had seen both caps on a table in her house on the night the men were talking about a robbery, but the caps were gone after defendants had left. Hilt's and Bayliss's house was on Golondrina Street, north of Ninth Street and a block west of Sterling Avenue.

In the evening on November 23, 1996, an anonymous tipster called the sheriff's station and reported that two people, identified as "Ace" and "Tony" had been talking about their involvement in the murder at the liquor store. After some further investigation, detectives found out that one of the men, "Ace," was defendant Bayliss. At trial, several witnesses who knew him referred to Bayliss by the nickname "Ace."

Soon after the killing, Hilt and Bayliss went to Los Angeles. Bayliss told Hilt he knew the police were looking for him to question him about the murder. Hilt and Bayliss also went to Sacramento before returning to San Bernardino. They stayed with Hilt's sister.

Edwina Newsom lived on Golondrina Street, several houses north of the house occupied by Hilt and Bayliss. Three buildings, apartments A, B, and C, were situated on the property where Newsom lived. Newsom lived in apartment A; Hilt's sister lived in apartment C. When Hilt and Bayliss returned to San Bernardino from Los Angeles and Sacramento, they stayed in apartment C with Hilt's sister. Because Hilt and Bayliss had

6

visited Hilt's sister in the past, Newsom was familiar with Hilt and Bayliss. Newsom had had several conversations with investigating officers, and gave the officers information about the killing. Among other things, Newsom told them that she had seen Bayliss and Burley apparently burying items that were supposed to have been connected to the killing. As a result of Newsom's information, officers recovered a .22-caliber handgun wrapped in newspaper, and a knit cap in a plastic baggie, buried behind Hilt's and Hilt's sister's residences, respectively.

On January 16, 1997, sheriff's deputies arrested Hampton and Bayliss at Hampton's house. Hampton lived on Hope Street, about two and one-half miles from the liquor store. Deputies impounded Hampton's car, a black Thunderbird, at that time.

Meanwhile, inside the liquor store, officers had recovered shells, wadding and pellets that indicated a shotgun had been used in the killing. Other shotgun pellet strikes were found outside the building. They also found shoeprints and tire tracks in dirt nearby and took impressions of the shoeprints and tire tracks. Plaster casts of the tire tracks matched the tires on Hampton's black Thunderbird. The shoeprints matched a pair of shoes owned by Mark Burley. Officers took David Reno to the impound lot to view Hampton's car. Reno recognized the triple taillights on Hampton's Thunderbird, and immediately said, "'That's it. That's the vehicle.'"

Hampton presented an alibi defense. His wife testified that she had used the family car, the Thunderbird, to attend school on Friday evening, November 22, and Saturday morning, November 23, 1996. She arrived home from school at approximately

7

10:30 p.m. on Friday. Soon afterward, at approximately 10:40 p.m., she and Hampton drove to Hampton's sister's house, but the sister was not there, so they returned home. After preparing their children for bed, Hampton's wife did ask him to go by his sister's house again, however. Hampton returned home before 12:00 midnight; Hampton and his wife then went to bed. The next morning, Hampton's wife drove the car to school in Riverside.

Bayliss elected not to present an affirmative defense, though he did call some of the prosecution witnesses and examined them for purposes of impeaching their testimony.

When defendants were arrested in January 1997, they were each charged with one count of murder in the first degree. The information included allegations as to each defendant that he personally used a shotgun in the commission of the offense (§ 12022.5, subd. (a)), and that a principal was armed with a shotgun (§ 12022, subd. (a)(1)). The information further alleged that each defendant had suffered a prior serious felony conviction (strike prior) (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The information was amended as to defendant Bayliss to allege an additional count that he was an accessory to murder (§ 32).

The court impaneled a separate jury for each defendant, and bifurcated trial on the strike priors. Hampton's jury found him guilty of murder in the first degree, and found true the allegations that he personally used a shotgun and that a principal was armed with a shotgun. Bayliss's jury found him guilty of first degree murder, and of being an

8

accessory to murder. Bayliss's jury found true the allegation that a principal was armed with a firearm in the commission of the murder. In a bifurcated court trial, the court found true the strike prior allegations as to each defendant.

The court sentenced Hampton to a term of 50 years to life for the murder (a term of 25 years to life, doubled for the "second strike" conviction), plus four years for the personal use enhancement. The court stayed the armed with a firearm enhancement. Bayliss received a similar sentence. Both defendants appealed.

On direct appeal, defendant (and his codefendant) argued : (1) that the court improperly denied their motions for mistrial when the prosecutor failed to turn over discovery promptly; (2) that the court improperly precluded them from inquiring into the custody status of one of the witnesses; and (3) that certain errors cumulatively prejudiced their trials: i.e., the defendants were precluded from bringing in certain evidence concerning possible third-party culpability, the court improperly allowed evidence to be admitted of threats against a witness, the court erred in allowing an officer to testify about certain information he was given by informants, and the court abused its discretion in precluding defendants from asking a police officer about newspaper articles. We affirmed the convictions. (*People v. Marlon Bayliss et al.,* E023847, unpublished opn. filed June 14, 2000.)

On May 3, 2019, following the enactment of section 1170.95 pursuant to Senate Bill No. 1437, Bayliss filed a petition for resentencing.[2]  The trial court determined that defendant had established a prima facie case for relief and set an evidentiary hearing[3] on the merits of the resentencing request.  A court trial was conducted at which the parties agreed the court would consider the clerk's transcripts, reporter's transcripts, and the unpublished opinion in the direct appeal, case No. E023847, as the record of conviction.  In addition, the parties agreed the court would consider a stipulated fact, to wit:  that the evidence logs and police reports show that a loaded .38 caliber handgun with electrical tape around the handle, was found near the crime scene.  The gun had been brought to court along with photos during the trial of the charges but were not offered into evidence.

After reviewing the evidence submitted at the hearing, the trial court found defendant Bayliss was armed with a firearm at the time of the attempted robbery, although he did not use it other than as a show of force for the robbery, which explained defendant's post incident behavior involving the gun.  The court concluded, after applying the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), that defendant Bayliss was a major participant based on his planning of the robbery and the supplying of the weapons.  The

---

**2**  On April 1, 2021, defendant filed a Petition for Writ of Habeas Corpus, challenging the validity of his first degree murder conviction as violative of *People v. Chiu* (2014) 59 Cal.4th 155, made retroactive in *In re Martinez* (2017) 3 Cal.5th 1216, 1223.  We address the petition in a separate order.

**3**  The trial court never expressly issued an order to show cause in setting the evidentiary hearing, but both parties proceed as if the court did so.

10

court also determined that Bayliss acted with reckless indifference to human life because he, along with Hampton, (1) knew a lethal weapon would be present; (2) did not take steps to try to save the victim or help him, after lethal force was used by Hampton; (3) Bayliss ran away and escaped the crime scene, and (4) did nothing to minimize the possibility of violence.

Concluding that a properly instructed jury would find defendant was a major participant, acting with reckless indifference to human life under current law, the court denied the petition for resentencing.

On September 23, 2020, defendant appealed.

**DISCUSSION**

Defendant argues the trial court applied the wrong standard of proof and that the judgment is not supported by the substantial evidence test. We will begin with a brief overview of the statutory procedure pertaining to evidentiary hearings on petitions for resentencing pursuant to section 1170.95 before addressing the specific points raised by defendant.

*A.        Review of the Statutory Scheme*

Following enactment of Senate Bill No. 1437, section 189, subdivision (e) now provides that a participant in the perpetration or attempted perpetration of a felony listed in subdivision (a), in which a death occurs, is liable for murder only if one of the following is proven: (1) The person was the actual killer; (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced,

11

solicited, requested, or assisted the actual killer in the commission of murder in the first degree; or (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2. (§ 189, subd. (e)(3).)

The Legislature enacted the amendments because it was concerned about the disparity between individual culpability and punishment then existing under the natural and probable consequences doctrine and the felony murder rule. (See Stats. 2018, ch. 1015, § 1, subds. (f), (g).) Senate Bill No. 1437 reformed aider and abettor liability in homicide cases to more equitably sentence both past and future offenders so that a person's culpability for murder must be premised upon that person's own actions and subjective mens rea. (*Ibid.*)

The Legislature incorporated the additional elements into section 189, subdivision (e) based on clarification provided by the Supreme Court in *Banks, supra*, 61 Cal.4th at pages 794, 803, and *Clark, supra*, 63 Cal.4th at pages 614-618, which, in turn, interpreted and applied holdings by the United States Supreme Court. As the Supreme Court explained in *Banks,* "Section 190.2(d) was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137 [(*Tison*)][95 L. Ed. 2d 127, 107 S. Ct. 1676], which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [(*Enmund*)][73 L. Ed. 2d 1140, 102 S. Ct. 3368], collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement

12

is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks,* at p. 794.)

*Banks* highlighted that, under *Enmund* and *Tison*, the focus is on "the defendant's personal role in the crimes leading to the victim's death." (*Banks, supra*, 61 Cal.4th at p. 801.) "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Id.* at p. 802.) As for the mental aspect of culpability, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' [Citation.]" (*People v. Wilson* (2021) 69 Cal.App.5th 665, 682.)

The existence or nonexistence of the elements (or factors) of major participation and reckless indifference to human life determine a defendant's eligibility for relief under section 1170.95 as a person who, although not the killer, was convicted of felony murder before the amendments to section 189. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 561, ["the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard for a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter"]; see also, *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419 [because "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes," a jury's true finding on section 190.2, subdivision (d) renders a section

1170.95 petitioner ineligible for relief]; *People v. Jones* (2020) 56 Cal.App.5th 474, 482, rev. granted Jan. 27, 2021, S265854.)

The factors to be considered include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra,* 61 Cal.4th at p. 803, fn. omitted.)

No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation "in criminal activities known to carry a grave risk of death" (*Tison, supra*, 481 U.S. at p. 157) was sufficiently significant to be considered "major and whose mental state is one of reckless indifference to the value of human life." (*Id.,* at p. 152.) While no single factor controls the determination, the answers to these questions aid in determining where on the spectrum of involvement in the underlying felony the non-killer coparticipant's conduct lies.

"If the section 1170.95 petition contains all the required information, including a declaration by the petitioner that he or she was convicted of murder and is eligible for relief [citation], section 1170.95, subdivision (c), requires the court to appoint counsel to

14

represent the petitioner, if requested; to direct the prosecutor to file a response to the petition and permit the petitioner to file a reply; and to determine if the petitioner has made a prima facie showing that he or she is entitled to relief." (*People v. Mancilla* (2021) 67 Cal.App.5th 854, 863; see also *People v. Lewis* (2021) 11 Cal.5th 952.

Then, if the requisite prima facie showing is made, the trial court is required to issue an order to show cause and conduct an evidentiary hearing to determine "whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1); *People v. Verdugo* (2020) 44 Cal.App.5th 320, 328, overruled on a different point in *People v. Lewis, supra,* 11 Cal.5th at pp. 961-962.)

"At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.]" (*People v. Lewis, supra*, 11 Cal.5th at p. 960.) The prosecutor and petitioner may rely on the record of conviction or offer new or additional evidence. (Se *People v. Tarkington* (2020) 49 Cal.App.5th 892, 898-899, overruled on a different point in *People v. Lewis, supra,* 11 Cal.5th at p. 963.; *People v. Edwards* (2020) 48 Cal.App.5th 666, 674, overruled on a different point in *People v. Lewis, supra,* 11 Cal.5th 963.)

The California Supreme Court has not yet explained what specific findings the trial court must make on the question of whether the People have proven, beyond a

reasonable doubt, that the defendant is ineligible for resentencing. Without guidance, a split of decision among the appellate districts has developed, as will be discussed below.

  B.  *Burden of Proof and the Trial Court's Duties Following the Evidentiary Hearing.*

    *1. The People's Burden of Proof*

  Defendant devotes considerable attention to the question of whether the trial court held the People to the proper burden of proof but, despite the focus given to the People's argument on that subject, the record shows the trial court reviewed the relevant case law and ruled that the People had the burden of proving beyond a reasonable doubt that the defendant falls into one of the categories that precludes resentencing relief. In other words, the trial court followed the statutory prescription that the People "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." The court specifically ruled that Senate Bill No. 1437 required the People to prove beyond a reasonable doubt that the defendant falls into one of the categories precluding resentencing, based on section (e)[4](1), (2) or (3). The People's attempts to persuade the court that it need only prove beyond a reasonable doubt that the defendant "could not be" as opposed to "would not be" convicted of first or second degree murder are irrelevant. The trial court imposed on the People the correct burden of proof.

---

[4] The Reporter's Transcript indicates the trial court initially referred to section "189 (e)(1), (2), and (3)," but at the end of the paragraph, the transcript mistakenly refers to section "189 (b)(1), (2), and (3)." We assume the court was referring to the same subdivision of section 189.

16

## 2. *The Standard of Proof by Which Trial Court Findings Are Made.*

The defendant also argues that the trial court applied the wrong standard in denying the petition, asserting that the court used a sufficiency of the evidence standard as opposed to a factual finding. However, defendant does not direct us to any place in the record where the court actually stated it would apply a substantial evidence review to determine if defendant could be convicted of murder. And during the hearing, the People reminded the trial court that it was obliged to make factual findings beyond a reasonable doubt. It was defense counsel who argued the court did not have to find facts beyond a reasonable doubt, although the defense argued the court must find all elements present, but the court's analysis of the specific elements applicable to the determination of the petition demonstrate it made findings on those elements in finding defendant ineligible for resentencing.

Divergent approaches have been adopted by the appellate districts regarding the nature of the findings the trial court should make in resolving a petition for resentencing following an evidentiary hearing. The statute does not state what the trial court's duty is vis-à-vis its role as a finder of fact. It simply refers to the court "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) A trial court could reasonably interpret this as requiring a determination of whether the defendant is eligible or ineligible, based on the People's

17

proof beyond a reasonable doubt that the requisite elements have been established, absent additional legislative direction.

Some guidance may be discerned from legislation passed following the Supreme Court's decision in *People v. Lewis, supra,* 11 Cal.5th 952, which clarified when counsel may be appointed for petitioners seeking resentencing relief and clarified the standard by which a prima facie basis for relief is determined. In that amendment, which became effective January 1, 2022, the Legislature codified the Supreme Court's holdings, and modified the language of subdivision (d)(3) of section 1170.95 by adding: "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (Stats. 2021 ch. 551 § 2 (Sen. Bill No. 775), effective January 1, 2022.)

The newest amendment suggests that the trial court must make findings on the existence of the elements of major participation and reckless indifference to human life, and not merely review the sufficiency of the evidence to support the jury's verdict, but even that is not clearly spelled out. But here, the court reviewed the evidence to determine the existence of the new elements rather than reviewing the record to determine if there was substantial evidence to support the first degree murder verdict.

The current split of authority is the subject of several cases which were pending at the time the Supreme Court ruled in *People v. Lewis, supra*, 11 Cal.5th 952. That split of authority was eliminated following the Supreme Court's actions in the affected cases.

Nevertheless, while the statutory language is less than clear, the Legislature's reference in section 1170.95, subdivision (d), to the evidence that is admissible in the evidentiary hearing which "the court" is required to "consider" strongly suggests that the trial court acts as a trier of fact at the hearing, at which the People have the burden to prove beyond a reasonable doubt that the defendant committed murder under the amended law. (§ 1170.95, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 295-296.) The trial court is not permitted to make its determination based on a finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter in the record of conviction. (§ 1170.95, subd. (d)(3).)

The defendant's argument may refer to language used by the trial court in its ruling, but, contrary to defendant's assertion, the court did not simply review the murder conviction to determine if there was substantial evidence to support first degree murder. The trial court did much more, and its ruling on eligibility for relief specifically addressed the evidence establishing the new statutory elements before ruling that the defendant was ineligible for resentencing.

The court first examined whether defendant was a major participant and reminded the parties that "the evidence has to show that Mr. Bayliss exhibited reckless indifference, which means that he knowingly engaged in criminal activities that he knew

19

involved a great risk of death. He must have been aware of and willingly involved in the violent manner in which the particular offense was committed, demonstrating reckless indifference to the significant risk of death his actions created."

The court then evaluated every *Banks* factor, using CALCRIM No. 540 as a guide. In the end, the court expressly concluded that defendant was a major participant. After reviewing the evidence supporting the existence of a reckless indifference to human life, the court stated, "if this case were tried in front of a jury, based on this evidence, the jury would conclude that Mr. Bayliss was a major participant who acted in reckless disregard [*sic*]."

The only reasonable interpretation of the court's ruling is that it made the factual determination that the two elements the People needed to prove beyond a reasonable doubt in order to justify a determination defendant was ineligible for resentencing had been proven beyond a reasonable doubt. We recognize the court's statement regarding what the jury would have found was similar to statements made in certain cases where the trial court was found to have applied an erroneous substantial evidence review of the record, but they do not necessarily mean the court applied the wrong standard. The court did not find there was substantial evidence to support the first degree murder conviction as happened in the cases where reversal was ordered.

Additionally, the statute simply refers to a determination whether the defendant was "ineligible for resentencing" based on the People's proof beyond a reasonable doubt relating to the new elements. The cases in which the trial court's findings were deemed

20

incorrect or inadequate invariably omitted the trial court's examination of and findings as to the elements of major participation and reckless indifference to human life, or the trial court's express assent that it must find the relevant factors required by section 189, subdivision (e)(3) true beyond a reasonable doubt, as happened here. Thus, while the court's findings did not expressly state the two factors were proven beyond a reasonable doubt, its reasoning demonstrates it did so find.

Further, the court's specific references to the People's burden of proof being beyond a reasonable doubt that the defendant is ineligible, its recognition that ineligibility required proof beyond a reasonable doubt that defendant's conduct falls within that described in section 189, subdivision (e), followed by its findings as to the *Banks* factors that were proven by the evidence, and its determination that a properly instructed jury finding the defendant guilty of first degree murder in the light of the required elements that he was a major participant who acted with reckless indifference, signifies the court necessarily applied the beyond a reasonable doubt test to the new statutory elements that must now be met pursuant to sections 188 and 189.

Because the court did examine and make findings that defendant was a major participant who acted with reckless indifference to human life, there is little room to argue that the court did not so find. It engaged in a meticulous and lengthy weighing of the factors prescribed by *Banks* and *Clark*, applying the evidence from the record of conviction, in addition to the newly stipulated fact that a second loaded firearm, provided by defendant, was involved in the crime. By concluding that defendant was ineligible for

21

resentencing, it necessarily found the People had proven beyond a reasonable doubt that the defendant was a major participant who acted with reckless indifference to human life, because those were the elements which, if proved beyond a reasonable doubt, rendered defendant ineligible for resentencing. To conclude otherwise on this record is to elevate form over function.

Finally, we note that at no point did the defendant seek clarification of the court's ruling and at no time did the court state that it was approaching the hearing as if it were a reviewing court determining if there was substantial evidence to support a finding on the new elements. The court's statements, read as a whole and in context, show that the court understood it was required to find the new elements of felony murder committed by someone other than the actual killer had been proved, not find merely that there was sufficient evidence from which some hypothetical jury could make such findings. In other words, the court did not simply apply an appellate substantial evidence standard to the first degree murder conviction.

In any event, even if the record could be susceptible to an inference that the court applied the wrong standard in denying the petition, any error was harmless beyond a reasonable doubt in light of the record evidence supporting the existence of the two new elements beyond a reasonable doubt, to which we now turn our attention.

*C. There is Substantial Evidence to Support the Determination that Defendant was a Major Participant Acting with Reckless Indifference to Human Life.*

Defendant argues that the People did not satisfy their burden of proof, and that the evidence is insufficient as a matter of law to support the judgment. We disagree.

*1. Standard of Review*

Defendant also argues that the *de novo* standard of review applies, referring to the standard applied in questions of statutory interpretation. We agree the de novo standard of review applies to questions of statutory interpretation. (*People v. Watson* (2021) 64 Cal.App.5th 474, 484, citing *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

However, on appeal from a denial of relief following an evidentiary hearing under section 1170.95, subdivision (d). We review the trial judge's factfinding for substantial evidence. (*People v. Clements, supra*, 75 Cal.App.5th at p. 298, citing *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) )

Under that familiar standard, "'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence-that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt'" under section 188 as amended. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *Clements, supra*, 75 Cal.App.5th at p. 298.)

In conducting a substantial evidence review, we presume the existence of every fact the court as fact finder could reasonably deduce from the evidence in support of the

court's order. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.) "'We do not reweigh evidence or reevaluate a witness's credibility.' [Citation.]" (*Whisenhunt, supra,* at p. 200.)

### 2. Analysis

Here, we are concerned with whether the record evidence contains substantial evidence to support the existence of the newly required elements applicable to a felony murder conviction of a participant who did not actually commit the killing. *Banks* and *Clark* hold that evidence showing no more than that a defendant is guilty of *felony murder simpliciter,* even if he knows a coperpetrator is armed, is insufficient to meet the minimum individual culpability standard of reckless indifference to human life. (*People v. Secrease* (2021) 63 Cal.App.5th 231, 260.) At the hearing, the parties stipulated that the court would base its decision on the record of conviction, which included the trial transcripts, the preliminary hearing transcript, and our decision in the direct appeal, *People v. Marlon Bayliss, et al.,* E023847, as well as the additional stipulated fact that a second loaded firearm, a .38 caliber handgun, was involved in the crime.

The record reveals that the court was attentive to the factors discussed in the *Banks* and *Clark* decisions, which aid in the determination of whether a defendant who is not the killer may be found guilty of first degree felony murder in light of the statutory changes to sections 188 and 189. The amended statutes imported the elements of "major participant" and "reckless indifference to human life" from section 190.2, where these

elements are pre-requisite to a true finding of special circumstances. (*Banks, supra,* 61 Cal.4th at p. 794.)

Applying the *Tison* factors, the *Banks* court went on to summarize: "With respect to the mental aspect of culpability, *Tison*, and in turn section 190.2(d), look to whether a defendant has "'knowingly engag[ed] in criminal activities known to carry a grave risk of death.'" [Citation.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra,* 61 Cal.4th at p. 801.) In enacting Senate Bill No. 1437, the Legislature extended the requirement that these elements be met for all persons charged with felony murder who are not the actual killer.

Respecting the subjective element of reckless indifference to human life, the California Supreme Court in *Clark* stated: "In determining whether Clark exhibited ""reckless indifference to human life"" within the meaning of section 190.2, subdivision (d), we look to whether the prosecution has introduced sufficient evidence of ""reasonable, credible, and of solid value"" to 'support a finding beyond a reasonable doubt' that Clark had the requisite mental state. [Citation.] The court emphasized, however, "'[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Clark, supra,* 63 Cal.4th at p. 618 )

Defendant argues that instead of making the requisite determinations as to the new statutory elements, the trial court applied a substantial evidence test. We disagree. This assertion is not supported by the record.

The trial court went through each factor described in *Banks* and *Clark* and carefully weighed the evidence adduced during trial, as the parties had stipulated that the court would consider the trial transcripts, preliminary hearing transcript, our opinion in the direct appeal, and the additional stipulated fact regarding the loaded .38 caliber handgun. In considering the evidence, the trial court carefully went through each factor to be assessed in making the determination that a defendant was a major participant acting with reckless indifference to human life and weighed the factors which establish substantial evidence to support the conclusion that defendant was a major participant who acted with reckless indifference.

Specifically, the court found, in support of the major participation element: The defendant was actively involved in planning the robbery that led to the homicide. He provided not one, but both loaded firearms carried by the defendant and Hampton to the robbery,[5] which increased the risk of lethal violence. He was present at the scene of the robbery, not in a getaway car; he was present at the shooting, unlike a getaway car driver. He actively participated in dumping evidence that might inculpate him, including his

---

[5] According to the record on appeal in Bayliss' original appeal, *People v. Hampton, et al.,* E023847, Bayliss provided the shotgun used by Hampton as well as the .38 caliber firearm that formed the basis for the armed enhancement against him. The trial court took judicial notice of the record on appeal at the time of the evidentiary on defendant's petition for resentencing.

loaded .38 caliber firearm, and did nothing to minimize the risk of lethal violence or to aid the victim after the lethal violence occurred.

The trial court struggled more with the element of reckless indifference to human life, but the court's major concern was that the shooting was sudden and spontaneous based on the Hampton's subjective fear that the victim was going to pull a firearm. Nevertheless, there is no arithmetic formula for determining the minimum number of factors required to meet the elements. (*Banks, supra,* 61 Cal.4th at p. 803.) Instead, as emphasized in *Banks,* there is a spectrum of conduct upon which the defendant's conduct must be plotted. (*Id.,* at p. 800, citing *Tison, supra*, 481 U.S. at p. 149.)

Here, as to the reckless indifference to human life element, the defendant's conduct placed him at the more culpable end of the spectrum, as reflected in the facts of *Enmund, supra,* 458 U.S. 782. The court found defendant knew that a lethal weapon would be present because he provided the loaded firearms with which both he and his coparticipant were armed; he knew the lethal weapons would be used as a show of force for purposes of committing the robbery; he was present at the robbery (as opposed to waiting in a car some distance from the crime) and was present when Hampton fired the shot that killed the victim and did nothing to aid the victim; he did not expect Hampton to fire the shotgun so he did not have an opportunity to stop the shooting; but he did not attempt to minimize the possibility of violence.

Reviewing the record of the evidentiary hearing as a whole, there is substantial evidence that defendant was a major participant who acted with reckless indifference to human life.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

CODRINGTON

J.

FIELDS

J.

28